## CASE NO. 21-1855

# IN THE

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

KENNETH ROBINSON; CHRISTOPHER HALL,

*Plaintiffs - Appellants,*

v.

PRIORITY AUTOMOTIVE HUNTERSVILLE, INC.,
d/b/a Priority Honda Huntersville; JAMES BECKLEY*,*

*Defendants - Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA AT CHARLOTTE

### RESPONSE BRIEF OF APPELLEES

King F. Tower
ktower@woodsrogers.com
Michael P. Gardner
mgardner@woodsrogers.com
Leah M. Stiegler
lstiegler@woodsrogers.com
Elaine D. McCafferty
emccafferty@woodsrogers.com
WOODS ROGERS, PLC
Wells Fargo Tower
10 South Jefferson Street
P. O. Box 14125
Roanoke, VA 24038
540-983-7600

*Counsel for Appellee
  Priority Automotive Huntersville, Inc.,
  d/b/a Priority Honda Huntersville*

Philip J. Gibbons, Jr.
phil@gibbonsleis.com
Corey M. Stanton
corey@gibbonsleis.com
GIBBONS LEIS, PLLC
14045 Ballantyne Corporate Place
Suite 325
Charlotte, NC 28277
704-612-0038

*Counsel for Appellee
  James Beckley*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 21-1855        Caption: Robinson et al. v. Priority Automotive Huntersville, Inc. et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Priority Automotive Huntersville, Inc.
(name of party/amicus)

who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.  Does party/amicus have any parent corporations?   ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐YES ☑NO
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _Leah Stiegler_____     Date: ____08/11/2021____

Counsel for: _Priority Automotive Huntersville, Inc.__

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 21-1855        Caption: Kenneth Robinson and Christopher Hall v. Priority Automotive Huntersville, Inc., d/b/a Priority Honda Huntersville, and James Beckley

Pursuant to FRAP 26.1 and Local Rule 26.1,

James Beckley
(name of party/amicus)

who is _____ Appellee _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?  ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Philip J. Gibbons, Jr.                    Date: _____08/11/2021_____

Counsel for: James Beckley

- 2 -

Print to PDF for Filing

TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................i

STATEMENT OF THE CASE...................................................1

STATEMENT OF FACTS ......................................................3

PROCEDURAL HISTORY...................................................17

STANDARD OF REVIEW ...................................................19

SUMMARY OF ARGUMENT ...............................................20

ARGUMENT ......................................................................20

    I.    The District Court Properly Granted Summary Judgment
        on Appellants' Unlawful Demotion Claims.........................23

    II.    The District Court Properly Granted Summary Judgment
        on Appellants' Hostile Work Environment and
        Constructive Discharge Claims..........................................27

        A.    The District Court Correctly Concluded
            Appellants' Working Conditions Were Not So
            Intolerable They Had No Choice but to Resign.......................28

        B.    Appellants' Subjective Beliefs Did Not Create
            Severe and Pervasive Hostile Working Conditions.................31

        C.    The District Court Correctly Concluded Appellees
            Took Prompt and Effective Remedial Action. ........................35

    III.    The District Court Properly Granted Summary Judgment
        on Appellants' Intentional Infliction of Emotional
        Distress Claims.................................................................38

    IV.    The District Court Properly Granted Summary Judgment on
        Appellants' Negligent Hiring and Supervision Claims.......................40

V.    The District Court Properly Granted Summary Judgment on Appellants' Conversion Claims. ........................................................42

VI.    Appellants Abandoned Their Retaliation, Negligent Infliction of Emotional Distress, and Trespass to Chattel Claims. .........................43

CONCLUSION...................................................................................45

REQUEST FOR ORAL ARGUMENT ....................................................46

CERTIFICATE OF COMPLIANCE.......................................................49

CERTIFICATE OF SERVICE ..............................................................50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baber v. Hosp. Corp. of Am.*,
 977 F.2d 872 (4th Cir. 1992) ...............................................................26

*Benson v. Vaughn Indus. LLC*,
 450 F. Supp. 3d 655 (E.D.N.C. 2020) ................................................23

*Bouchat v. Baltimore Ravens Football Club, Inc.*,
 346 F.3d 514 (4th Cir. 2003) ...............................................................20

*Bristow v. Daily Press, Inc.*,
 770 F.2d 1251 (4th Cir. 1985) ...............................................29, 31, 34

*Bryant v. Aiken Reg'l Med. Centers Inc.*,
 333 F.3d 536 (4th Cir. 2003) ...............................................................44

*Calloway v. Lokey*,
 948 F.3d 194 (4th Cir. 2020) ...............................................................19

*Dash v. Mayweather*,
 731 F.3d 303 (4th Cir. 2013) ...............................................................34

*DeJarnette v. Corning, Inc.*,
 133 F.3d 293 (4th Cir. 1998) .........................................................31, 32

*E.E.O.C. v. Cent. Wholesalers, Inc.*,
 573 F.3d 167 (4th Cir. 2009) ...............................................................36

*E.E.O.C. v. TJX Companies, Inc.*,
 2009 WL 159741 (E.D.N.C. 2009) ......................................................40

*E.E.O.C. v. Xerxes Corp.*,
 639 F.3d 658 (4th Cir. 2011) ...............................................................36

*Edwards v. City of Goldsboro*,
 178 F.3d 231 (4th Cir. 1999) ...............................................................43

*Evans v. Int'l Paper Co.*,
 936 F.3d 183 (4th Cir. 2019) .....................................................27, 28, 37

i

*Faragher v. City of Boca Raton*,
    524 U.S. 775 (1998).........................................................................30

*Freeman v. Dal-Tile Corp.*,
    750 F.3d 413 (4th Cir. 2014) ....................................................28, 35

*Green v. Brennan*,
    136 S.Ct. 1769 (2016).....................................................................28

*Holland v. Washington Homes, Inc.*,
    487 F.3d 208 (4th Cir. 2007) ....................................................23, 24

*Holmes v. Bevilacqua*,
    794 F.2d 142 (4th Cir. 1986) ..........................................................29

*Hughes v. Bedsole*,
    48 F.3d 1376 (4th Cir. 1995) ..........................................................27

*Jackson v. TYCO Elecs. Corp.*,
    2017 WL 2266851 (E.D.N.C. 2017)................................................38

*Kirschbaum v. McLaurin Parking Co.*,
    188 N.C. App. 782, 656 S.E.2d 683 (2008) ..............................42, 45

*Maryland Highways Contractors Ass'n, Inc. v. State of Md.*,
    933 F.2d 1246 (4th Cir. 1991) ..................................................30, 42

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973).........................................................................23

*Mitchell v. Lydall Inc.*,
    16 F.3d 410 (4th Cir. 1994) ......................................................40, 44

*Munday v. Waste Management of North America*,
    126 F.3d 239 (4th Cir. 1997) ..........................................................31

*Ocheltree v. Scollon Prods., Inc.*,
    335 F.3d 325 (4th Cir. 2003) ..........................................................29

*Paschall v. Tube Processing Corp.*,
    2021 WL 1390350 (S.D. Ind. Apr. 13, 2021)...................................29

*Pennsylvania State Police v. Suders*,
542 U.S. 129 (2004)...........................................................................27

*Ricketts v. Logics, LLC*,
2017 WL 4293406 (E.D.N.C. Sept. 27, 2017) ...................................30

*Roberts v. Glenn Indus. Grp., Inc.*,
2019 WL 356809 (W.D.N.C. 2019) ....................................................38

*Sherrod v. Harkleroad*,
791 F. App'x 377 (4th Cir. 2019) ......................................................43

*Smith v. First Union Nat'l Bank*,
202 F.3d 234 (4th Cir. 2000) .............................................................27

*Springs v. Mayer Brown, LLP*,
2009 WL 3461231 (W.D.N.C. Oct. 20, 2009) ...................................44

*Vance v. Ball State Univ.*,
570 U.S. 421 (2013)...........................................................................40

*Waddle v. Sparks*,
331 N.C. 73 (1992) ............................................................................38

*White v. BFI Waste Servs.*, LLC,
375 F.3d 288 (4th Cir. 2004) .............................................................35

*Whiteman v. Chesapeake Appalachia, L.L.C.*,
729 F.3d 381 (4th Cir. 2013) .............................................................19

**Statutes**

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e
*et seq*. .........................................................................2, 18, 23, 27, 29

Civil Rights Act of 1991, 42 U.S.C § 1981 *et seq*..........................2, 23, 27

North Carolina Equal Employment Practices Act, N.C. Gen. Stat. § 143-422.1 *et
seq*. ..................................................................................2, 23, 27

**Other Authorities**

Federal Rule of Appellate Procedure 28(a)(8)(A) ....................................43

Federal Rule of Appellate Procedure 32.................................................................49

Federal Rules of Civil Procedure 56.....................................................................30

## STATEMENT OF THE CASE

Appellee Priority Automotive Huntersville, Inc. d/b/a Priority Honda Huntersville ("Priority") hired a new General Manager ("GM"), Appellee James Beckley ("Beckley") on July 19, 2019, for its dealership in Huntersville, North Carolina. Appellants Kenneth Robinson ("Robinson") and Christopher Hall ("Hall") are African American and were employees of Priority at the time of Beckley's arrival. Within five days of Beckley's arrival, Appellants resigned.

It was over this five-day span that Appellants unreasonably ascribed some race-based intent to nearly all of Beckley's actions, despite recognizing that Beckley was taking steps that were typical operational changes when new GMs are brought onboard. For instance, by 8:30 a.m. on Beckley's first day, Appellants felt like Beckley had physically segregated the dealership by race—a position they maintain on appeal despite it being overwhelmingly debunked by the evidence in the record, including their own testimony. Through discovery, it became clear that Appellants' perceptions of hostile treatment were wholly speculative and they often inferred racist intent in everyday statements simply because, in their own words, the speaker was white.

Nonetheless, Appellees took their concerns seriously. Appellants submitted written complaints about Beckley to Priority's Controller, Diane Ulmer ("Ulmer"), who, as Appellants admitted, promptly began an investigation into their allegations.

1

Appellants, though, dismissed her efforts and resigned, and now refer to Ulmer's efforts as "lackluster." (Appellants Br. 8). Appellants assume without any supporting evidence that Ulmer's efforts were insufficient to remedy any alleged wrongs, despite the fact that they resigned without any indication of the impact of the investigation.

Following their resignation, Appellants filed the instant action asserting claims of unlawful demotion, retaliation, hostile work environment and constructive discharge under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII"), the Civil Rights Act of 1991, 42 U.S.C § 1981 *et seq*., and the North Carolina Equal Employment Practices Act, N.C. Gen. Stat. § 143-422.1 *et seq.* ("NCEEPA"), as well as intentional infliction of emotional distress, negligent infliction of emotional distress, negligent hiring, retention and supervision, trespass to chattel, and conversion of Appellants' personal property. After the conclusion of discovery, the District Court properly granted Appellees' motions for summary judgment on all claims, finding, among other things, that while "[Appellants'] impressions may be sincerely held, [] subjective perceptions of intolerable conditions are insufficient [to withstand] summary judgment when unsupported by the evidence in the record." (JA 1536). This appeal followed. Appellees respectfully request the judgment of the District Court be affirmed.

## STATEMENT OF FACTS

### I.    Priority Hires Beckley as GM

In mid-July 2019, Priority hired Beckley as its new GM at its Huntersville, North Carolina dealership.  (JA 376 ¶8, 718).  Beckley came to Priority with more than seven years of experience as a GM, having previously served at Scott Clark Honda and Keffer Mazda—two dealerships also located in North Carolina.  (JA 1002, 1011).  Prior to arriving, Beckley understood that he would be coming onboard with an aim to immediately improve the dealership's financial circumstances and to reorganize the dealership's infrastructure and inventory.  (JA 719-20, 1006-07, 1050).  Beckley had done a walk-through of the dealership before his first-day and felt Priority's appearance needed immediate attention, as the carpet in the main showroom was stained, trash and cigarette butts were discarded around the facility, and unused and outdated computer equipment was being "stored" in public areas throughout the dealership.  (JA 719-20).

Priority's Controller Diane Ulmer explained that the dealership had not been performing to expectations and was not as profitable as it should have been.  (JA 375 ¶7).  Priority's former GM, Sam Asaad, quit unexpectedly in early June 2019 and took a number of Priority's employees with him.  (JA 375 ¶10).  Priority brought in an interim-GM, George Watson, while it recruited another GM.  (JA 375 ¶10).

3

Robinson, who is African American, started at Priority in August of 2018 as a Sales Associate under then-GM Assad.  (JA 375 ¶9).  Robinson later moved into an Internet Manager position and, when interim-GM Watson, who is also African American, started, he provided Robinson a new pay plan, which Robinson refused, claiming he felt like Watson was trying to "push him out."  (JA 375-76 ¶10). Interim-GM Watson eventually agreed to making Robinson a Sales Manager on July 11, 2019—only a week before Beckley started.  (JA 70, 376 ¶10).  Hall, who is African American, started at Priority (for the second time) in May 2018 as a Sales Manager.  (JA 376 ¶11, 474-76).

## II.    Friday, July 19, 2019 – Beckley's First Day

On Friday, July 19, 2019, Beckley arrived at 8:30 a.m. for his first day.  (JA 71, 167).  On this first day, Beckley brought with him about ten new employees from Keffer Mazda who he hoped to onboard immediately.  (JA 177-184, 376-77 ¶13, 719-20, 1024-31).  This group of employees was ethnically diverse.  Two were African American, one was Puerto Rican, one was Mexican, one was Native American, one was Pakistani, and one was Italian.  (JA 177-184, 719-20, 1024-31). Despite bringing on new employees, Beckley had no intent of making any personnel changes to the existing staff until after he got a grasp on the financial and infrastructure issues he believed he was facing, and until after he had an opportunity to evaluate the existing personnel.  (JA 376-77 ¶13, 720).

4

Appellants recognized it is common in the industry for new GMs to bring trusted employees with them. Hall admitted, in fact, that he had previously transferred dealerships with new GMs and that he had "seen it a couple times." (JA 473). Despite this recognition, Appellants perceived that in this situation the dealership "was separated by race" because they believed Beckley brought with him a "white crowd." (JA 82-85, 490). Appellants admitted, though, that this "white crowd" included African Americans and many other non-white people. (JA 82-92, 177-184, 242-43, 376 ¶13, 490-91). Appellants' own witness, Kyle Vasquez, not only called the group of employees Beckley brought with him "diverse," but further called the notion that the store was separated by race "silly." (JA 243, 251).

That day, Priority owner Matt Ellmer ("Ellmer") called an all-staff meeting and introduced Beckley. (JA 71, 73, 184). Beckley made a few comments regarding the future of the dealership, and the rest of the day was hectic—as one would expect during a change in control. (JA 245, 377-78 ¶15 and ¶18, 553,1031). Controller Diane Ulmer began working to onboard the new employees, Beckley began cleaning up trash and working on a plan to restructure the dealership's physical layout and financial processes, and staff scrambled to help Beckley and Ulmer, while continuing to perform regular duties as sales and service customers arrived. (JA 246-48, 377 ¶18).

Despite the expected "chaos," Robinson felt he did not receive the respect he deserved, claiming, "I wasn't given the respect as a human being to even be[] introduced to my new boss on the day of his arrival." (JA 79-80, 118-19, 477, 553). Specifically, Robinson was upset Beckley did not immediately give him direction or shake his hand, and that he had not had an opportunity to speak with anyone about the changes that were occurring at the dealership that day. (JA 79-82, 107). The dealership has about 90 employees, and there is no evidence in the record that Beckley purposefully avoided Appellants. (JA 378 ¶18).

Holding true to his intent on addressing infrastructure, Beckley relocated the "Sales Tower" to the sales lobby in an effort to increase sales efficiency. (JA 106, 246-47, 377 ¶16, 484). Before Beckley arrived, the sales team sat about 90 feet from the lobby, completely out of sight of where customers waiting for their cars to be serviced sat, which significantly reduced sales opportunities to those customers. (JA 199-201, 377 ¶16, 503-04). It also prevented Sales Associates from conveniently consulting with Sales Managers, as the Sales Associates would have to leave customers unattended to travel to the other end of the showroom. (JA 721). Beckley's "relocation" of the Sales Tower did not involve moving any furniture or equipment because Priority already had an existing piece of furniture in the lobby that had been previously installed for this purpose but was unused at the time. (JA 377-78 ¶16, 721-22). Beckley never instructed Sales Associates to not approach

6

Robinson or Hall; rather he instructed all Sales Managers to confer with Sales Associates at the new location. (JA 228-29, 248-49, 275-76, 377-78 ¶¶16-17, 483, 721). Appellants *chose* to remain at their old desks. (JA 100-01, 248-49, 278, 377-78 ¶17). Hall explained that he and Robinson just sat around and watched everyone work: "We were just watching things move around. The desks were being thrown out. We were just sitting in the middle of the floor." (JA 478).

Appellants argue the change in location of sales deals occurred because of their race and that Beckley made the change with some unlawful intent to demote them because of their race. (JA 83-92, 100-01, 107-08, 477-82). Robinson had no support for this accusation other than saying that he did not have advance notice of the changes and that "no white man, like James Beckley is, would do that to another white man." (JA 107-08). Appellants also do not dispute that staff of all races— Black, white, Hispanic—stopped approaching them to perform deals, *because they took the deals to the new sales area* where Appellants chose not to go. (JA 83-92, 258-59, 274, 474-84, 552-53). Robinson specifically admitted that race was not a factor in where sales deals were conducted, stating, "Race not considered. Black, white. Gender not considered." (JA 92).

## III.  Saturday, July 20, 2019 – Beckley's Second Day

The next morning, Beckley held a sales meeting. (JA 93). Beckley explained at the sales meeting that despite bringing on new employees, everyone would be on

7

his team unless he told them otherwise so they should continue to perform their job duties. (JA 344-45, 720). Appellants admit Beckley instructed them to "[j]ust keep doing what [they]'re doing." (JA 488-89).

Beckley also decided to read aloud a text message he received from a Honda representative in an effort to get the Sales Associates excited about an opportunity for doing quick deals that could increase sales compensation. (JA 93-94, 99-100, 1032). The message said something to the effect of, "Let's run 65 percent penetration and make Priority Honda great again." (JA 129-30, 184-85, 1032). Appellants explained they and the African American community perceived this "MAGA" statement as racist because it is associated with former President Donald Trump. (JA 96-97, 129-30, 514-15, 559).

Appellants also took issue with what they believed was a poor training technique when Beckley, in this meeting, played a recording of Sales Manager Robert Gathers, who is African American, on a customer call and explained to the sales team how to improve the call. (JA 93-96, 152-53, 492-96). Beckley had implemented this same technique at prior dealerships and listened to about 20 sales calls the night before from various sales employees before choosing a call he felt would best exemplify his training objective. (JA 186-94). Beckley never mentioned the employee's name during the training exercise and did not know who the

employee was, or the employee's race, until after the meeting concluded.  (JA 187, 252-55).

Appellants conceded that Beckley did not make any racist comments in critiquing the sales call, nor did he identify the employee by name.  (JA 152-53, 557-58).  Gathers himself recognized there was no intent to humiliate Gathers because of his race.  (JA 346).  Beckley also called out a non-African American employee at the sales meeting as part of his training exercise.  (JA 265-67).  Regardless, Robinson felt the use of the sales call was belittling, and speculated Beckley "would [n]ever do that to a white man."  (JA 96).  Hall likewise believed the decision was racially motivated, speculating, "I just think that, because of who he was, he picked the call." (JA 495, 558-59).

Robinson also testified that Beckley "rearranged the whole dealership" in the middle of the night and his computer was moved along with other personal belongings like his cup and family pictures, but he never tried to locate his belongings.  (JA 100-01).  Hall claims his keys, pictures, and some medicine was missing after the reorganization, and he likewise never tried to locate his belongings. (JA 485-86).  While Robinson recognized that a physical reorganization of the sales floor is common when a new GM comes onboard, Robinson believes Beckley's reorganization was also based on race, again speculating so merely because Beckley is a white man: "I don't think that no white man, like James Beckley is, would do

9

that to another white man. He would give them the courtesy to explain to them that what was going on." (JA 107-08). Further, Appellants admit the physical reorganization impacted all employees—not just Appellants. (JA 100-06, 199-225, 246-49, 378 ¶20, 484).

Appellants confronted Beckley about their employment prospects later that morning. (JA 117-20, 482-83). "What is our job? What are we supposed to do?" asked Hall. (JA 482). Beckley told them to "do what [they have] been doing." (JA 482). Appellants admitted that they were never told they were demoted. (JA 117-21, 482). Rather, they felt like Beckley brushed them off, told them he would get to it on Monday after he had a chance to speak with the Controller, and failed to clarify whether their pay would change or what their position would be under the new leadership. (JA 74-75, 117-21, 482-89). Robinson felt Beckley's word was not enough of a commitment and they should have been afforded formal written pay plans at that exact moment. (JA 117-21). In fact, he "explained to Mr. James Beckley that that's not how that process works, that you don't have a conversation about what your pay is." (JA 117).

Appellants perceived that all employees except them received new pay plans within days of Beckley's arrival, when, in fact, only Sales Associates received new pay plans that quickly—not any managers. (JA 230-37, 271-73, 489). Again it was only Beckley's second day; Beckley was still reviewing Priority's processes and

10

determining where resources and personnel were needed, and he also had to run management pay plans and many other aspects of the business by Ellmer. (JA 237, 720).

## IV.    Sunday, July 21, 2019 – Beckley's Third Day

Appellants did not work Sunday, but changes did occur at the dealership. Beckley had an internal wall taken down that was blocking a pathway to the sales desks to further increase the efficiency of the sales process. (JA 109, 200-02, 378 ¶19, 515, 722).

## V.    Monday, July 22, 2019 – Beckley's Fourth Day

Robinson claimed that on "Monday, the same thing resumed . . . . You come to work to work. But you have no work provided to you. That doesn't work nowhere in this country." (JA 109). Robinson again called Ulmer and Human Resources about his concerns. (JA 114-15). Gathers observed Appellants refusing to work and noted that Appellants "felt like [Beckley] should approach [them] with direction each day on the job. . . . [Appellants] would just show up and sit in the car or just sit at the sales desk and watch everyone work." (JA 345).

Robinson alleged another employee, Kyle Vasquez, told him and other sales employees that Beckley told other employees Appellants were no longer managers, Appellants were "thugs," and for no one to talk to them (a comment Beckley denies making). (JA 76, 87-88, 268-69). Hall also claimed Vasquez told him Beckley said

11

something to the effect of, "Kyle, you shouldn't be hanging out with those 'thugs,'" referring to Appellants. (JA 497-99). But, Vasquez testified the "thugs" comment was not even directed at Appellants specifically, that the group of employees that Beckley allegedly referenced as "thugs" included non-African American employees, and Vasquez himself did not perceive the comment as race-based. (JA 259-67). Vasquez also testified he never told Appellants that anyone told him employees should no longer work with Appellants. (JA 246-51, 274-78).[1]

## VI.    Tuesday, July 23, 2019 – Beckley's Fifth Day

### A.    Appellants Reported Concerns of Pay and Hostile Work Environment.

Around 11:00 a.m. on July 23, 2019, Hall reached out to Ulmer to get more clarity about his duties and "where we were as far as Mr. Beckley coming in, what we were supposed to do." (JA 506-07, 564-66). Ulmer advised him to speak with Human Resources and provided the appropriate number. (JA 506-08, 564-66).

At 1:04 p.m., Robinson emailed Ulmer with three complaints: First, he claimed he was told he was demoted, told to sell cars, but never given a new pay plan. (JA 116, 164). Robinson later testified this was not true, but he wrote it

---

[1] Robinson posits he learned of this "thug" comment at work on July 21, 2019, but also stated that was his day off. (JA 77). Hall claims he learned about the comment on Friday, July 19, 2019. (JA 496-97). For purposes of summary judgment, Appellees assumed it allegedly occurred on Monday, July 22, 2019, the same day Vasquez resigned. (JA 259).

because he was still unclear about his duties. (JA 116-23, 145). Second and third, Robinson claimed he was experiencing a racially hostile work environment because of Beckley's so-called MAGA statement and the alleged reference from Vasquez that Beckley referred to Appellants as "thugs." (JA 123-24, 164). Ulmer forwarded the complaint to Human Resources and promptly began to investigate. (JA 280-315, 379).

By 1:48 p.m. that afternoon, Hall texted Ellmer expressing his concerns that he was "told [he and Robinson] were no longer managers," was working without a pay plan and was not going to work around racial jokes, referring to Beckley's so-called MAGA statement and the alleged comment that he and Robinson were "thugs." (JA 509-18, 564-66). Hall forwarded this text to Ulmer. (JA 380 ¶25, 517-18). Hall admitted that even though he wrote he was "told" he was no longer a manager, that, similar to Robinson, this statement was not in fact true and it was just his perception based on the Sales Associates working deals in the new location. (JA 511).

While Ulmer began investigating, Robinson ran into another employee, Wallah Richardson, who is African American. (JA 134). According to Robinson, Richardson told him he overheard a conversation between Lolli Cornelius and another employee, Bill Anderson, where Lolli allegedly stated Anderson needed to get with the "white side" and join the new management team. (JA 134-41). At 2:23

p.m., Robinson emailed Ulmer again to let her know he left work for the day due to what he perceived was a racially-charged work environment based on what he heard from Richardson and because he now felt like he was in danger.  (JA 134-45, 140-41, 165, 379 ¶24).   Hall testified he personally overheard Cornelius' alleged statement though conflictingly also alleged he heard about it only through Robinson and never included it in his complaint to Ellmer, not to mention he appeared to be at the dentist during the afternoon the alleged statement was made.  (*Compare* JA 14 ¶27, and JA 564-65, 585-86, *with* JA 538-39).

### B.    Priority Immediately Investigated Appellants' Concerns.

Consistent with Company policy, Ulmer began her investigation by speaking with Beckley, Cornelius, Richardson, and Anderson.  (JA 280-86, 380 ¶¶26-27).  In speaking with Beckley, Ulmer learned Beckley was relaying another's statement when he made the so-called MAGA statement, and he claimed he never made the "thugs" comment.  (JA 303-06, 311-12).   Ulmer also learned from talking to Richardson, Cornelius, and Anderson that Cornelius never said, "white side." (JA 322-25, 380 ¶27).  In fact, Richardson himself stated he and other employees were describing the changes Beckley was making at the dealership, and Cornelius said something like, "Trust me, you're on the *right* team."  (JA 339-42 ¶¶4-5) (emphasis added).   Richardson, who is African American, later stated, "I kind of felt like Robinson used me."  (JA 339-42 ¶6).

14

## C.     Appellants Dismissed Priority's Efforts to Address Their Complaints and Quit Instead.

That same afternoon, Ulmer called Robinson in to discuss all of Robinson's complaints and her investigation.  (JA 125-28, 133, 380-81 ¶28).  Robinson testified that he felt "blindsided" that Beckley was in the meeting.  (JA 126-27).  Ulmer chose to have Beckley present because Priority's investigation revealed most of Robinson's concerns appeared to be the results miscommunications or misunderstandings.  (JA 295-96).  Also, one of Robinson's chief complaints was that Beckley had not met with him or discussed his compensation.  (JA 79-80).  While Robinson took issue with the fact that Beckley was in the meeting, he admitted they discussed everything of concern to Robinson.  (JA 126-28).

Beckley also apologized for any poor choice of words he may have made, which Robinson admitted appeared sincere.  (JA 129-31).  Beckley presented Robinson with a pay plan for a Sales Associate position, though Robinson would not sign it, stating, "I did not come there to be a salesperson.  Never would have done that."  (JA 131-32).  Robinson later contradicted himself by stating he would have worked as a Sales Associate and had accepted a Sales Associate pay plan just a month earlier with a previous GM.  (JA 142-44, 154-55, 375 ¶9).  Robinson also admitted *he did not care what position he was in*, his frustration stemmed from just wanting a direct command from Beckley earlier than Tuesday: "you are fired.  You

are demoted.  This is your new pay plan.  Take it or leave it.  That didn't happen.

Had that happened, we wouldn't be on this [deposition]."  (JA 109-113, 122).

Ulmer attempted to report what she learned about the "white side" allegation

(according to Robinson's own source, the word used was "right," not "white"), but

Robinson dismissed her.  (JA 380-81 ¶28).  Instead, Robinson testified "right side"

is equally offensive to him because "the underlying portion of the statement is that

there was a side, whether it was right or white or left.  There was a side.  And I was

on one side, and they were on the other."  (JA 137-40).  Robinson ironically made a

sweeping racial generalization in describing what he perceived to be Cornelius's

"motive": "I think she's just acting as any other, you know, white American woman

would normally act, that this is common for them to do that, to say these things."

(JA 139).

Ultimately Robinson refused to accept the results of Priority's investigation

and testified there was nothing Priority could have done differently, as he claims

"the only thing that could have been different is . . . I would have had to have been

born white."  (JA 150).

Ulmer also tried a couple times to speak with Hall about her investigation,

but, after confirming he would return to speak with her or Beckley, he failed to come

back to the dealership and never returned for employment.  (JA 311-14; 517-25, 529-

30, Ex. 31).  Hall explained via text that he was dealing with a lot because he got

16

"put out of [his] home."  (JA 520-21, 585-86).  Hall complicated things as well by testifying that his real reason he did not return was that he did not want to meet with Beckley (after complaining that Beckley had not met with him), despite having texted Ulmer about getting evicted and texting, "Ill go see jb tomorrow for sure and sit down with him and whatever it is it is."  (*Compare* 520-23, *with* JA 586).  Ulmer later memorialized the findings of her investigation.  (JA 316-21, 326-28, 381 ¶30, 467-70).

In his deposition, Robinson accused Beckley of "cleaning up" the dealership by "getting rid of the Black managers," but admitted he resigned before knowing how racially diverse the dealership was the few weeks after Beckley started.  (JA 151, 147-48).  In fact, Beckley terminated Caucasian Sales Managers for poor performance and policy violations shortly after he started.  (JA 382 ¶¶32-33).  It is undisputed Beckley had a diverse group of employees, having upwards of 20 African American employees on his team and employees of color making up 50% of the dealership, many of them managers.  (JA 177-84, 376 ¶¶13 and 33, 719 ¶6; *see generally* employee declarations: JA 329-82).

## PROCEDURAL HISTORY

After Appellants filed the instant action and discovery closed, Appellees moved for summary judgment.  (JA 60-63, 590-92).  The District Court issued a memorandum opinion granting the motion as to all claims.  (JA 1530-40).  In its

opinion, the District Court held that Appellants failed to demonstrate that any harassment was sufficiently severe or pervasive to constitute a hostile work environment and that Plaintiffs failed to establish a triable claim for constructive discharge. (JA 1535-36). For example, the District Court reasoned that a "single offhand comment including the term 'thug' does not constitute severe and pervasive conduct that would leave an employee no choice but to resign." (JA 1536). Appellants' other allegations of a hostile work environment failed because there was "no evidence" that they were racially motivated and the statement "make Priority Honda great again" is not actionable under Title VII. (JA 1536).

Turing to the unlawful demotion and retaliation claims, the District Court determined that Appellants did not suffer any adverse employment action. (JA 1537). Additionally, because Appellants alleged they were demoted on Friday, July 19 2019, and "did not engage in protected activity until July 23," 2019, the District Court concluded there is "no evidence that an adverse employment action of any nature occurred *as a result* of Plaintiffs engaging in protected activity." (JA 1537-38) (emphasis added).

The District Court next considered Appellants' claims of intentional infliction of emotional distress, negligent infliction of emotional distress, and general negligence. (JA 1538). Observing that intentional infliction of emotional distress must be "so severe that no reasonable man could be expected to endure it," the Court

18

concluded no evidence suggested Appellants met this high standard. (JA 1538).

Appellants' negligence claims failed because inherently intentional conduct, such as

discrimination, cannot support claims for negligence. (JA 1538-39). Similarly, an

element of negligent hiring, supervision, and retention is incompetency, and the

District Court found no evidence suggested Beckley was incompetent. (JA 1539).

Finally, the District Court granted summary judgment on Appellants' trespass

to chattel and conversion claims because they "concede[d] that Beckley's

reorganization of the showroom was within his discretion," and merely "assumed

that their personal belongings were moved during this reorganization." (JA 1540).

The District Court entered an order in accordance with its opinion dismissing

the complaint with prejudice. (JA 1540). This appeal followed.

## STANDARD OF REVIEW

This Court "review[s] a summary judgment de novo, applying the same

standard that the district court was required to apply." *Calloway v. Lokey*, 948 F.3d

194, 201 (4th Cir. 2020). "[S]ummary judgment is warranted if, from the totality of

the evidence, including pleadings, depositions, answers to interrogatories, and

affidavits, the court believes no genuine issue of material fact exists for trial and the

moving party is entitled to judgment as a matter of law." *Whiteman v. Chesapeake*

*Appalachia, L.L.C.*, 729 F.3d 381, 385 (4th Cir. 2013). "A party opposing a properly

supported motion for summary judgment 'may not rest upon the mere allegations or

denials of [his] pleadings,' but rather must "set forth specific facts showing that there is a genuine issue for trial." *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 525 (4th Cir. 2003) (citation omitted).

## SUMMARY OF ARGUMENT

Appellants' case is based on a list of approximately eight occurrences they repeatedly cite in support of each claim in an attempt to justify proceeding to trial. These instances range from non-actionable undisputed facts, to debunked and inadmissible hearsay, to outright speculation without evidentiary support. In fact, Appellants walked off the job just days into the tenure of Beckley after a series of perceived slights no reasonable person would find so intolerable that the only option they had was to resign. Appellees attempted to address Appellants' concerns, but they quit anyway. There is no evidence in the record that any of Beckley's actions were based on Appellants' race, and the District Court properly granted summary judgment.

## ARGUMENT

As an initial matter, Appellants main argument on appeal is that the District Court erred by not viewing the totality of the evidence in a light most favorable to Appellants, contrary to the summary judgment standard. Appellants ask the Court to misapply the standard though, and would require the District Court to take Appellants' assumptions and speculation as fact despite evidence to the contrary,

20

including Appellants' own testimony and testimony from Appellants' own witnesses.

By way of example, Appellants argue that Beckley told other employees to stop bringing sales deals to Appellants and that this evidenced some racial motive by Beckley because Appellants are African American.  Appellants, however, both testified that they never personally heard Beckley tell employees not to work with them, and they only assumed it was true based on Sales Associates telling them that they were directed to bring sales deals to the new Sales Tower location in the lobby. Appellants both testified that Beckley moved the Sales Tower, which was consistent with every other witnesses' testimony and photographic evidence that the location of the Sales Tower changed, and that sales deals were to take place in the lobby. Beckley testified that he told all sales employees to bring deals to the new Sales Tower.  The evidence also showed that Appellants, even by their own testimony, remained at the old Tower and watched other employees work, and that no one knew why Appellants decided to remain at the old Tower when there was nothing preventing them from walking to the new location to perform work.

Despite this overwhelming and uncontradicted evidence in the record, Appellants *still* make the argument that the District Court should have taken Appellants' statements that Beckley directed Sales Associates to not work with them because of their race as true, and that doing so would create a genuine issue of

21

material fact. But the standard does not allow this kind of bootstrapping. The District Court correctly concluded that there was no evidence supporting Appellants' assumptions that Beckley's decision to change the Sales Tower location was because of their race. Not only did Appellants rely on inadmissible hearsay of what Sales Associates allegedly told them, but what the Sales Associates allegedly told them was, in fact, consistent with everyone else's testimony—Beckley changed the location of where sales were processed to increase the efficiency of the dealership. Appellants presented no evidence to support their assumption that this change occurred *because they are African American*; rather, they argued that this change occurred, *and* they are African American, which is insufficient as a matter of law. It is further undisputed that Sales Associates of multiple races (Black, White, Hispanic) were taking deals to the new Sales Tower as Appellants remained seated by their own volition at the old Tower.

Appellants' brief is replete with references to occurrences like the above example that Appellants characterize as supporting their claims, but in fact proved to be unsupported assumptions that the District Court correctly found were either not true or lacked any race-based intent or nexus. The District Court is not required to take unsupported assumptions as fact merely because they are favorable to the Appellant; rather, the District Court is required to resolve genuine disputes of

22

material fact in favor of the non-moving party.  The District Court did just that, and the District Court's judgment should be affirmed.

## I.    The District Court Properly Granted Summary Judgment on Appellants' Unlawful Demotion Claims.

Appellants claim they were unlawfully demoted because of their race in violation of Title VII, the NCEEPA, and 42 U.S.C. § 1981.  To prove discrimination under § 1981 and Title VII, Appellants must prove (1) direct evidence of discrimination; or (2) a prima facie case of discrimination through the *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) burden-shifting approach.  *See Benson v. Vaughn Indus. LLC*, 450 F. Supp. 3d 655, 663 (E.D.N.C. 2020).  Appellants fail to adduce any direct evidence of discrimination.  Thus, to proceed under *McDonnell Douglas*, Appellants must establish a prima facie case of race discrimination.  *Id.* at 665.

To establish a prima facie unlawful demotion claim, Appellants must show (i) they are a member of a protected class; (ii) they were demoted; (iii) they were fulfilling their employer's legitimate expectations at the time of their demotion; and (iv) the demotion occurred under circumstances permitting a reasonable inference of race discrimination.  *Id.*  If met, the burden shifts back to Appellees, "to articulate a legitimate, nondiscriminatory reason for the adverse employment action."  *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007).  The burden then

shifts back to Appellants to prove by a preponderance of the evidence that Appellees' stated reasons were not its true reasons, but were a pretext for discrimination. *Id.*

Appellants contend the District Court erred by finding that Appellants did not suffer any adverse employment actions and therefore they failed to meet their burden to establish a prima facie case. (Appellant Br. 14). Appellants explain that, by instructing Sales Associates to not take sales to Appellants, Beckley effectively demoted them. (Appellants Br. 14).

As the District Court correctly concluded, Hall was never demoted before he resigned; he only "felt" like he was demoted. (JA 482). Therefore, his prima facie claim fails. While Hall complained that he was subject to constant changes in compensation, he admitted in discovery this was not true and that he had never had any changes in his compensation when he resigned. (JA 526-27). Robinson also alleges he felt like he was demoted on Friday, but admitted that the Controller told him he was still a Sales Manager and Robinson admitted he was "paid as such." (JA 83). On Saturday, Robinson learned first-hand from Beckley he may or may not be demoted down the road as Beckley needed to evaluate employees and speak with the Controller in the coming week. (JA 113, 117-18, 120-24, 532-33, 344-45 ¶6 and 348-49 ¶6). Finally, Robinson testified that any demotion would not have bothered him; he just wanted clarity. (JA 109-12, 122).

Even if Appellants' subjective perceptions were enough, which they are not, there is no evidence either Appellant's alleged demotion occurred under circumstances permitting a reasonable inference of race discrimination. Appellants claim Beckley did not demote non-African American Sales Managers by instructing Sales Associates to not take sales deals to them. (Appellant Br. 14). Appellants, though, failed to point to any evidence in the record to support this assertion, and as discussed above, this claim was thoroughly debunked in discovery.

Appellants testified that the dealership rearrangement was not specific to them and that Beckley "rearranged the whole dealership" (JA 100) from "the front of the store to the back." (JA 484). It is undisputed that, as part of his reorganization, Beckley changed the location of the Sales Tower, which affected all sales employees, yet Appellants remained at the old Tower. Beckley testified he told "all the employees the new locations where we work deals at." (JA 227)

As with most of their allegations, Appellants have no direct knowledge of this claim, but instead heard it from others, like their own witness Kyle Vasquez. (JA 479-80, 926-27). But Vasquez denied he or others were verbally instructed not to work with Appellants. (JA 275-76). Instead, Vasquez testified, the location of doing deals changed (JA 258-59) and Vasquez stated he did not know why Appellants stayed at their old location. (JA 248-49). It is undisputed that other non-white and African American employees were using the new location. (JA 91-92, 258-59).

25

Even if Appellants' hearsay accounts were either true or admissible, the record is devoid of any evidence that they were denied deals because of their race. Appellants' alleged inference is nothing more than false speculation that the change in location was somehow based on their race, and their claim must fail. *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 875 (4th Cir. 1992) (finding unsupported speculation is insufficient to defeat summary judgment).

Appellants also argue the District Court erred by ignoring Appellants' evidence from former GM Asaad that Appellants exceeded expectations. (Appellants Br. 17). However, it cannot be said Appellants were performing to Appellees' legitimate expectations from the time Beckley started at the dealership. It is undisputed Beckley informed Appellants to keep performing work as they had been, yet both Appellants admitted they sat around and watched desks be reorganized while everyone else worked. (JA 111, 478). It was even observed by Gathers that Appellants refused to work and felt as if Beckley should approach them about their duties. (JA 344-47 ¶7 and 348-50 ¶7). Ulmer similarly observed Appellants not working. (377-88 ¶¶16-17).

Appellants' only attempt at establishing pretext is to claim that Appellees demoted all the Black managers, but this is false and Appellants admit they resigned before seeing who Beckley demoted or promoted. (JA 147-48, 530-31). It is undisputed that Beckley terminated only one African American Sales Manager and

the reason was that this employee could not get a sales license as required by the State of North Carolina. (JA 382 ¶¶32-33). Beckley likewise terminated a white Sales Manager for the same reason, and two white Sales Managers for poor performance. (JA 382 ¶¶32-33). Two other African American Sales Managers and four other Sales Managers of color remained Sales Managers or were promoted. (JA 382 ¶¶32-33). Appellants' pretext argument is, again, based on speculation that is either unsupported or outright contradicted in the record.

For these reasons, the District Court's finding that Appellants failed to demonstrate a prima facie case of race discrimination should be upheld.

## II.   The District Court Properly Granted Summary Judgment on Appellants' Hostile Work Environment and Constructive Discharge Claims.

Appellants claim they were forced to resign after experiencing a racially-charged hostile work environment in violation of Title VII, the NCEEPA,[2] and 42 U.S.C. § 1981. This combined hostile environment and constructive discharge claim is also known as a "hostile-environment constructive discharge" claim. *Evans v. Int'l Paper Co.*, 936 F.3d 183, 191 (4th Cir. 2019) (citing *Pennsylvania State Police v. Suders*, 542 U.S. 129, 147 (2004)).

---

[2] The NCEEPA does not provide a private right of action, except for wrongful discharge in violation of public policy, and Appellants were not discharged so their claim fails. *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th Cir. 2000). Even if NCEEPA supported a constructive discharge theory, it must fail for the same reason Appellants' Title VII claims fail. *Hughes v. Bedsole*, 48 F.3d 1376, 1383 (4th Cir. 1995).

27

To succeed, Appellants must demonstrate (i) they experienced unwelcome harassment; (ii) the harassment was based on their race; (iii) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (iv) there is some basis for imposing liability on Appellees. *See id.* at 192. And, because Appellants resigned, they must show "something more"—they must show that Appellees deliberately discriminated against them "to the point where a reasonable person in [their] position would have felt compelled to resign." *Id.* at 193 (citing *Green v. Brennan*, 136 S.Ct. 1769, 1777 (2016)). Appellants, therefore, must also prove two additional elements to maintain the constructive discharge aspect of their claim: (v) the deliberateness of Appellees' alleged actions, motivated by race bias; and (vi) the objective intolerability of their working conditions. *See Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 425 (4th Cir. 2014). Appellants fail on all fronts.

## A. The District Court Correctly Concluded Appellants' Working Conditions Were Not So Intolerable They Had No Choice but to Resign.

Appellants again point to their list of occurrences that allegedly happened at the dealership and argue the District Court overlooked this list in determining Appellants had not satisfied their burden. Again, Appellants' "list" is based on unsupported assumptions that the District Court correctly found were either not true or that lacked any race-based intent or nexus. The only "nexus" that Appellants presented is to assert that these things happened, and they (Appellants) are also

black, but that is not sufficient. Indeed, it is not a nexus at all. Rather, Appellants must prove these things happened *because* they are black. *See Holmes v. Bevilacqua*, 794 F.2d 142, 145 (4th Cir. 1986) ("These things happen, and you are black. Not these things happen because you are black. The law requires that the word 'because' be the conjunction."). Appellants failed to present any evidence they experienced severe or pervasive conduct *because of* their race, much less, "a calculated effort to pressure [them] into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by [their] co-workers." *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985).

Appellants' concern that Beckley put a spin on former President Trump's MAGA slogan does not in any way implicate race despite Appellants' assertions it is offensive to the African American community at-large. Even assuming Beckley's comment somehow expressed an endorsement of the former President, this comment is neither objectively offensive, nor tied to race. *See Paschall v. Tube Processing Corp.*, 2021 WL 1390350, at *23-*24 (S.D. Ind. Apr. 13, 2021) (finding "no such authority appears to exist" in support of a Title VII claim "in reference to 'Make America Great Again'"); *see also Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333 (4th Cir. 2003) (noting the "severe or pervasive" element has both subjective and objective components that must be proven). The District Court correctly concluded this statement is not actionable under Title VII. (JA 1536).

29

As to the alleged "thug" comment, Beckley denied referring to Appellants as thugs, and Vasquez—the sole source of this hearsay allegation[3]—denies it was race based or directed at Appellants.  Even assuming Beckley said "thugs," one off-hand comment, especially one that Appellants only heard about second-hand through another employee who testified it was not directed specifically at Appellants, is not enough to constitute severe and pervasive conduct that would leave an employee with no choice but to resign.  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"); *see, e.g., Ricketts v. Logics, LLC*, 2017 WL 4293406, at *7 (E.D.N.C. Sept. 27, 2017) (finding Appellant having overheard references to "African-Americans' as crackheads, thugs, or criminals" as "not sufficiently severe or pervasive to alter the conditions of her employment and create an abusive workplace").

Robinson claims he did not get a handshake on Beckley's first day.  Appellants both claim employees were told not to work with Appellants, and they were not provided a pay plan by Beckley's second morning on the job.  None of

---

[3] In order to oppose a motion for summary judgment, the non-moving party must identify <u>admissible</u> evidence creating a genuine issue for trial.  Repeating unsupported allegations, particularly in the form of inadmissible hearsay, does not meet this burden under Rule 56 of the Federal Rules of Civil Procedure. *See Maryland Highways Contractors Ass'n, Inc.*, 933 F.2d at 1251.

these allegations include any evidence that they were based on race, but even assuming these allegations were true, the Fourth Circuit has held that being ignored by co-workers and top management was insufficient to establish constructive discharge. *See Munday v. Waste Management of North America*, 126 F.3d 239, 244 (4th Cir. 1997). "Every job has its frustrations, challenges, and disappointments; these inhere to the nature of work," and an employer should not have to face liability every time management fails to shake an employee's hand or refuses to acquiesce to an employee's demands. *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985). Whether Beckley made poor management decisions is irrelevant so long as they were not because of Appellants' race. *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 298-99 (4th Cir. 1998). It is certainly undisputed that it was a busy and chaotic first few days for Beckley and all employees.

## B. Appellants' Subjective Beliefs Did Not Create Severe and Pervasive Hostile Working Conditions.

Appellants' allegations contain an additional caveat: Appellants allege they know Beckley's conduct was because of their race because *they know* how white people in general act and *they know* a white man like Beckley would not do these things to another white man, or *they know* it is based on race because (in regards to the "thug" allegation), "what else could it be based on?" (JA 498-99).

For instance, the recording Beckley played for training purposes was selected because the employee was a Sales Manager—not because he was African American.

31

Again, Appellants must prove with evidence that Beckley chose to play Gathers' sales call for the group *because of* Gathers' race, rather than merely stating that Beckley played Gathers' sales call *and* Gathers is African American. Appellants' only attempt at a nexus between Gathers' race and the sales call was that they simply speculated that "Beckley would never do that to a white man." (JA 96, 494-96). Speculation, though, is both inadmissible and insufficient for summary judgment purposes. It is undisputed that Beckley did not know who the employee was at the time he selected the call after having listened to about 20 sales calls to get an idea of the sales process employees were using. (JA 186-94).

Further, Gathers himself was not offended (JA 346 ¶12) and it is unlikely any reasonable person would find it offensive. If managers are required to use only white employees as examples for training purposes, then the discrimination allegation could swing the other way. Some flexibility must exist in the workplace for an employer to perform its operations without every act being perceived as racist. A bad sales call is a bad sales call, regardless of race or ethnicity, and what constitutes a bad sales call is within the employers' own business discretion. *See DeJarnette*, 133 F.3d at 298-99 (noting the court cannot sit as a super-personnel department determining whether the employer's decisions were wise, fair, or even correct, so long as they were non-discriminatory).

Appellants likewise try to claim that the physical reorganization of the

32

dealership had to do with race merely because Appellants "don't think that no white man, like James Beckley is, would do that to another white man. He just simply wouldn't. He would give them the courtesy to explain to them what was going on." (JA 107-08). Again, Appellants' speculation cannot carry the day. It is undisputed that changes were made to clean the dealership up and make it more efficient, and these changes impacted all employees.

Even Appellants' inflammatory "white side" allegation, which they still argue is racist now knowing Cornelius said, "right side," is likewise unsupported as nothing more than their own conjecture that Cornelius was "acting as any . . . white American woman would normally act." (JA 139, 538-41). It is undisputed that Appellants' speculation about what they allege they heard was completely debunked, even by the speaker himself. (JA 339-42). Nonetheless, Appellants press forward and argue that the District Court overlooked the fact that Beckley allegedly created a racially hostile work environment "so blatant that it made another white employee comfortable to tell other Caucasian employees to 'come to the white side.'" (Appellants Br. 24). Again, not only is it undisputed Cornelius said "right," not "white," Appellants presented no evidence demonstrating there is some nexus between this statement, which they heard through hearsay, the changes Beckley was making at the dealership, and their race.

Appellants make these accusations despite other African American employees

asserting they are not true and having different experiences. (See generally employee declarations: JA 329-82). "Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). And because speculation is Appellants' only basis for asserting these things occurred *because of their race*, they fail to present the requisite evidence of deliberateness.

Appellants further fail to demonstrate their working conditions were objectively intolerable. The fact that Robinson asserts he "c[ouldn't] take it" any more, (JA 109), is not enough. "[T]he law does not permit an employee's subjective perceptions to govern a claim of constructive discharge." *Bristow*, 770 F.2d at 1255. Appellants' claims that they *felt* like Beckley brought with him a "white team," *felt* that the store was separated by race, and *felt* that employees were not performing deals with them because they were African American; but Appellants' feelings do not satisfy their high burden when Appellants' testimony indicates Beckley's alleged "right team" included non-white and African American employees and that African American employees were conducting deals at the new sales deal location, and therefore the store could not have been physically separated by race. (JA 90-92, 490-92). The District Court correctly noted that, while Appellants' impressions may

34

be sincerely held, they are insufficient for summary judgment purposes when contradicted by what the undisputed record shows actually occurred. *See White v. BFI Waste Servs.*, LLC, 375 F.3d 288, 296 (4th Cir. 2004).

## C. The District Court Correctly Concluded Appellees Took Prompt and Effective Remedial Action.

There is no basis for imputing liability to Appellees. Priority never dismissed Appellants' concerns. It is undisputed that Priority promptly investigated and attempted to resolve Appellants' misunderstandings and clarify Beckley's conduct. *Freeman*, 750 F.3d at 424 (noting an employer's obligation to "take prompt remedial action reasonably calculated to end the harassment"). Instead, it was Appellants who dismissed Priority's efforts and they continue to dismiss those efforts on appeal. Appellants argue that Appellees should not be afforded an affirmative defense because they perceive Priority failed to investigate their complaints "as they should have been investigated." (Appellants Br. 22). Specifically, Appellants point to the fact that Priority's initial investigation took  only two hours, that Ulmer failed to speak to Vasquez or other African American employees that could have been offended by the MAGA comment, and that Ulmer had Appellants meet with Beckley to review their findings with them, which they believed was improper as he was the accused actor. (Appellants Br. 22-23).

Appellants misapply the standard. An employer's obligation is to take prompt and remedial action reasonably calculated to end the harassment. There is no

requirement for an employer to implement the very techniques an employee desires the employer to implement. In fact, "[t]here is no 'exhaustive list' or 'particular combination' of remedial measures or steps that an employer need employ to insulate itself from liability." *E.E.O.C. v. Xerxes Corp.*, 639 F.3d 658, 669 (4th Cir. 2011) (citing *E.E.O.C. v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 178 (4th Cir. 2009)). Courts have "considered the promptness of the employer's investigation when complaints are made, whether offending employees were counseled or disciplined for their actions, and whether the employer's response was actually effective." *Id.* An employer's remedial action may even prove to be ineffective in stopping the harassment (*i.e.,* it happens again), yet may nevertheless be found reasonably calculated to prevent future harassment and therefore adequate as a matter of law. *Id.* at 670.

Within minutes of learning of Appellants' initial complaints, which were almost verbatim the same, Ulmer contacted Human Resources and began investigating as directed. She spoke with Beckley first as Appellants main concerns involved him. Contrary to Appellants' position, nothing about Appellants' initial complaints or follow-up conversations put Ulmer on notice that Vasquez, Quinton Alston, or Michael Gaston would have relevant information and the standard certainly does not require an employer to interview every African American in the dealership simply because two African American employees complain. Once Ulmer

36

received Robinson's follow-up email with the egregious "white side" allegations, Ulmer immediately expanded the scope of her investigation, interviewing Richardson, Anderson, and Cornelius. After concluding that there was clearly some miscommunication, she attempted to have Appellants meet with her and Beckley to review each concern.

Beckley apologized to Robinson for any potential "poor choice of words." (JA 131). Even though Robinson admitted Beckley was "sincere" in clarifying his conduct, Robinson also admitted he never gave Appellees the chance to remedy any wrongs as the only thing that would have addressed his concerns is, in Robinson's own words, for Robinson to be white. (JA 131, 150). It is undisputed that Hall never afforded Appellees the ability to discuss the results of Priority's investigation as he refused to return to work. As the District Court correctly held, Appellants failed to meet their burden because "[u]nless conditions are beyond ordinary discrimination, a complaining employee is expected to remain on the job while seeking redress." *Evans*, 936 F.3d at 193 (citations omitted). This, Appellants did not do.

For these reasons, the District Court's finding that Appellants failed to meet the standard for a hostile work environment claim, much less the heightened standard for a combined hostile-environment constructive discharge claim should be upheld.

**III.    The District Court Properly Granted Summary Judgment on Appellants' Intentional Infliction of Emotional Distress Claims.**

To succeed on a claim for intentional infliction of emotional distress ("IIED") Appellants must demonstrate (i) extreme and outrageous conduct by Appellees; (ii) which is intended to, and does in fact cause; (iii) severe emotional distress. *Jackson v. TYCO Elecs. Corp.*, 2017 WL 2266851, at *4 (E.D.N.C. 2017) (citing *Waddle v. Sparks*, 331 N.C. 73, 82 (1992)).  "The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it." *Id.* (citing *Waddle*, 331 N.C. at 84).  This burden is high.  "North Carolina courts have been extremely reluctant to find actionable IIED claims in an employment context. This is true, even in the face of egregious facts." *Roberts v. Glenn Indus. Grp., Inc.*, 2019 WL 356809, at *4 (W.D.N.C. 2019).

Appellants argue that a reasonable jury could find the collective action of the occurrences, to which they repeatedly cite to, constitute outrageous and intolerable conduct.  (Appellants Br. 25).  As discussed above, the majority of these eight occurrences were completely debunked, including by Appellants' own testimony, and any remaining fact-based occurrences, such as the so-called MAGA statement, lacked any evidence of race-based intent or intent to cause severe emotional distress.

Indeed, the undisputed evidence demonstrates that Appellants experienced confusion and uncertainty, which is plainly insufficient to satisfy the high burden of an IIED claim.  The first few days of Beckley's employment at the dealership were

hectic. Beckley was onboarding a new group of employees, reorganizing the internal layout and sales processes, and spending time reviewing financial statements and inventory. Appellants both admitted their main issue with Beckley was that Beckley did not speak to them and they were not provided an explanation for the changes he was implementing. (JA 481). In fact, Robinson explained that his lawsuit would not have been forthcoming if he had just had some kind of direction from Beckley about his future with Priority in the first 48 hours. (JA 122). While it may have been stressful seeing changes occur and not knowing what exactly would happen with their employment, such stressors are fairly normal inconveniences during a change in control. Even Appellants' own witness, Vasquez, recognized that it was fairly normal, stating, "[I]t was just a normal [day]. . . . [Beckley's] a busy man, too. He's . . . a GM, so he don't really have time to small talk about anything." (JA 245). And the undisputed testimony is that Beckley repeatedly directed them to keep doing what they had been doing before his arrival.

Appellants argue the District Court overlooked Beckley's alleged "thug" comment or his alleged comment to Vasquez to take "them" and another black employee with Vasquez when Vasquez resigned. (Appellants Br. 26). Appellants only allege they heard these comments through Vasquez. An IIED claim cannot be met with hearsay without showing that Beckley made these statements knowing they would eventually make their way to Appellants; Appellants must prove that Beckley

intended to cause them severe emotional distress with these statements. Further, it is undisputed that the moment Appellants raised concerns related to a hostile work environment, Priority took prompt and effective action to remedy any alleged wrongs.

For these reasons, the District Court's finding that Appellants failed to meet the high standard for an IIED claim should be upheld.

## IV. The District Court Properly Granted Summary Judgment on Appellants' Negligent Hiring and Supervision Claims.

Appellants also alleged a litany of negligence claims[4] against Appellees with regard to Beckley allegedly being incompetent, but these also fail.

To succeed on claims for negligent hiring and negligent supervision/retention, Appellants generally must prove: (i) Beckley was incompetent; (ii) Beckley committed a tortious act; (iii) that injured Appellants; and (iv) prior to the act, Priority knew or had reason to know of Beckley's incompetence. *E.E.O.C. v. TJX*

---

[4] Appellants' general negligence claim is not actionable alone but instead appears to be an attempt at replacing Title VII's vicarious liability standard with an additional common law cause of action, and summary judgment was properly granted in Appellees' favor. *See Vance v. Ball State Univ.*, 570 U.S. 421, 443 (2013). Even if common law negligence was an appropriate claim in this case, which it is not, no conduct occurred that rises to the level of a breach of any duty. Appellants' negligent infliction of emotional distress claim fails also as a matter of law. *See generally Mitchell v. Lydall Inc*., 16 F.3d 410 (4th Cir. 1994) ("When the plaintiff's complaint alleges acts of discrimination that are intentional in nature, and simply concludes that the acts were committed negligently, it is insufficient to state a claim for negligent infliction of emotional distress.").

*Companies, Inc.*, 2009 WL 159741, at \*10 (E.D.N.C. 2009) (citing North Carolina law and the similarity of elements for both claims). Appellants argue the District Court overlooked evidence that Beckley stayed late on his first night as GM and threw away Appellants' personal belongings, thereby committing a tortious act. (Appellants Br. 28). However, even assuming this is true, which it is not, Appellants still fail to present evidence to support any remaining elements.

Appellants argue that Priority had reason to know Beckley was allegedly incompetent because Hall testified that he had heard through the grapevine that Beckley had left his employment at Scott Clark Honda for engaging in discriminatory conduct. (Appellants Br. 28). Appellants' argument is insufficient. First, Appellants' argument is again based on inadmissible hearsay. Hall testified, "I haven't really dug into it, but I've heard a couple things why he left." (JA 745-46). Hall speculates that it must have been discriminatory or racial conduct, but Appellants fail to point to any precedent that intentional discrimination constitutes "incompetence" under North Carolina law. (JA 746). And, even if this were true, Appellants presented no evidence that Priority knew or had reason to know of the same information Hall knew about Beckley before hiring Beckley as its GM, and certainly had no reason to know Beckley would be likely to engage in "conversion" of Appellants' personal property. It is undisputed Beckley came to Priority with more than seven years of experience as a GM and an even longer tenure in the car

industry.  (JA 1002, 1009-1017).  It is further undisputed Priority had no indication of prior allegations of harassment or discrimination involving Beckley.  (JA 1111-1113).

The District Court correctly concluded that there was no evidence in the record to suggest Beckley was incompetent.  For these reasons, the District Court's opinion should be upheld.

## V.   The District Court Properly Granted Summary Judgment on Appellants' Conversion Claims.

Appellants' property claims were properly dismissed as Appellants failed to demonstrate Priority had either actual or constructive possession of their specific goods in question, and further failed to prove there was an unauthorized taking or dispossession of their property.  *See Kirschbaum v. McLaurin Parking Co.*, 188 N.C. App. 782, 787, 656 S.E.2d 683, 686 (2008).  Appellants claim that Beckley stayed late on his first day and threw away their belongings.  While Beckley denies throwing away any of Appellants' belongings (JA 1058), Appellants' only evidence in support of this claim is, again, inadmissible hearsay that cannot be used to oppose summary judgment.  *See Maryland Highways Contractors Ass'n, Inc. v. State of Md.*, 933 F.2d 1246, 1251 (4th Cir. 1991).

It is undisputed that a physical reorganization occurred whereupon dealership property was temporarily moved around, and, it is undisputed that Appellants resigned before the reorganization was complete.  While Appellants now allege that

42

their missing belongings were part of a hostile work environment that was so intolerable they had no choice but to resign, they testified that they did not even bother looking for their belongings at the time. (JA 486, 627). Accordingly, the District Court correctly concluded that Appellants assumed their belongings were moved during the reorganization and took no action to locate or retrieve their belongings, and therefore the District Court's opinion should be upheld.

## VI. Appellants Abandoned Their Retaliation, Negligent Infliction of Emotional Distress, and Trespass to Chattel Claims.

Appellants' brief is devoid of any argument regarding their retaliation, negligent infliction of emotional distress, and trespass to chattel claims. (*See, e.g.*, Appellants Br. 10 1isting claims challenged on appeal and failing to include retaliation, negligent infliction of emotional distress, or trespass to chattel). "When a party fails to raise an issue in its opening brief, it is considered waived or abandoned." *Sherrod v. Harkleroad*, 791 F. App'x 377, 382 n.4 (4th Cir. 2019). Federal Rule of Appellate Procedure 28(a)(8)(A) requires the argument section of an opening brief to contain an appellant's "contentions and reasons for them, with citations to the authorities and parts of the record on which the appellant relies." "Failure to comply with the specific dictates of this rule with respect to a particular claim triggers abandonment of that claim on appeal." *Edwards v. City of Goldsboro*, 178 F.3d 231, 241 n. (4th Cir. 1999). Because Appellants failed to include any

argument on their retaliation, negligent infliction of emotional distress, and trespass to chattel claims in their brief, these claims are abandoned.

In any event, the District Court correctly granted summary judgment on these claims. It is well established under North Carolina law "that inherently intentional conduct, such as discrimination, cannot support a claim for negligent infliction of emotional distress." *Springs v. Mayer Brown, LLP*, 2009 WL 3461231, at * 7 (W.D.N.C. Oct. 20, 2009) (citing *Mitchell*, 16 F.3d at 410). Appellants' claim of negligent infliction of emotional distress relates to Beckley's alleged intentional conduct of discrimination. As such the District Court correctly dismissed this claim as a matter of law, and therefore the District Court's decision should be upheld.

To establish a prima facie retaliation claim, a plaintiff must show (i) he engaged in protected activity; (ii) he suffered an adverse employment action; and (iii) his employer took the adverse action because of the protected activity. *Bryant v. Aiken Reg'l Med. Centers Inc*., 333 F.3d 536, 543 (4th Cir. 2003). Hall admits he never experienced any change in pay or position and thus did not suffer any adverse action. (Memorandum in Support of Priority's Motion for Summary Judgment Ex. 3 pp. 105-13, 124). Robinson suffered no adverse action because he ultimately admitted he would not have worked at Priority regardless of position—"not as a sales manager, not as salesperson, not as a janitor." (JA 143, 146). Robinson also maintains that he felt like he and Hall were demoted on Friday, July 19, 2019—

44

before he even engaged in any alleged protected activity. (JA 111-13, 120-24). In light of this timeline, the District Court correctly held there "is no evidence that an adverse employment action of any nature occurred as a result of Plaintiffs engaging in protected activity." (JA 1537-38).

To establish trespass to chattel, "a plaintiff must 'demonstrate that [the defendant] had either actual or constructive possession of the personalty or goods in question at the time of the trespass, and that there was an unauthorized, unlawful interference or dispossession of the property.'" *Kirschbaum*, 656 S.E.2d at 686. There is no evidence in the record that Priority had actual or constructive possession of Appellants' personal belongings or that any possession constituted unauthorized or unlawful interference. Robinson testified that "different items and stuff was moved and threw [sic] away" during the reorganization of the "whole dealership" on Friday July 19, 2019. (JA 100, 148-49). Hall testified that he did not even look for his belongings. (JA 665-66). In other words, Appellants assumed their belongings were moved during the reorganization but failed to present any evidence this occurred.

## CONCLUSION

For the foregoing reasons, the judgment of the District Court should be affirmed in all respects.

## REQUEST FOR ORAL ARGUMENT

Appellees request oral argument in this matter.

Respectfully submitted,

PRIORITY AUTOMOTIVE
HUNTERSVILLE, INC.

By:    /s/ King F. Tower
                Of Counsel

King F. Tower (NC Bar No. 31841)
ktower@woodsrogers.com
Michael P. Gardner, Esq. (VSB No. 80380)
mgardner@woodsrogers.com
Leah M. Stiegler, Esq. (VSB No. 89602)
lstiegler@woodsrogers.com
Elaine D. McCafferty (VSB No. 92395)
emccafferty@woodsrogers.com
WOODS ROGERS PLC
P.O. Box 14125
10 South Jefferson Street, Suite 1400
Roanoke, Virginia 24038-4125
Telephone:(540) 983-7600
Facsimile: (540) 983-7711
*Counsel for Appellee Priority Automotive*
*Huntersville, Inc.*

47

Respectfully submitted,

JAMES BECKLEY

By:____/s/ Philip J. Gibbons, Jr.
                    Of Counsel

Philip J. Gibbons, Jr., Esquire
Corey M. Stanton
Gibbons Leis, PLLC
14045 Ballantyne Corporate Place
Suite 325
Charlotte, North Carolina 28277
Telephone: (704) 625-2834
phil@gibbonsleis.com
corey@gibbonsleis.com
*Counsel for Appellee James Beckley*

## CERTIFICATE OF COMPLIANCE

1. This Brief of Appellee has been prepared in a proportionally spaced typeface using Microsoft Word, Times New Roman, 14-point font.

2. Exclusive of the cover page, disclosure statement, table of contents, table of authorities, statement regarding oral argument, signature block, and the certificates of compliance and service, this Brief of Appellees contains 10,708 words.

3. This Brief of Appellees complies with the type-volume limitation of Rule 32 of the Federal Rules of Appellate Procedure.

/s/ King F. Tower
Counsel for Appellee Priority Automotive Huntersville, Inc.

/s/ Philip J. Gibbons, Jr.
Counsel for Appellee James Beckley

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of October, 2021, I caused this Brief of

Appellees to be filed electronically with the Clerk of the Court using the CM/ECF

System, which will send notice of such filing to counsel of record in this matter.


  /s/ King F. Tower
Counsel for Appellee Priority Automotive
Huntersville, Inc.


    /s/ Philip J. Gibbons, Jr.
Counsel for Appellee James Beckley